FILED by ___JA___ D.C.

**Jan 19, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

# 21-60020-CR-DIMITROULEAS/SNOW

Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
18 U.S.C. § 220(a)(1), (a)(2)(A), (a)(2)(B)
18 U.S.C. § 1956(h)
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 1957(a)
18 U.S.C. § 1344(2)
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1), (a)(2)(A), (a)(7)

UNITED STATES OF AMERICA

vs.

JONATHAN MARKOVICH,
RICHARD WASERSTEIN,
DANIEL MARKOVICH,
CHRISTOPHER GARNTO,
JOSE SANTEIRO,
DREW LIEBERMAN,
MARIO KUSTURA, and
FRANK BOSCH, JR.,

Defendants.

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### Drug and Alcohol Rehabilitation

1.       Substance abuse treatment regulations described a continuum of care for patients experiencing substance abuse including, from most intensive to least intensive, detox, residential

treatment, partial hospitalization ("PHP"), intensive outpatient ("IOP"), and outpatient ("OP").[1] The varying levels of treatment provided were based on the severity of a patient's addiction and the patient's current symptoms. Persons undergoing treatment on an outpatient basis, whether in PHP, IOP, or OP, often elected to live in a "recovery residence," also known as a "sober home," "halfway house," or in some cases "community housing," with other persons who were also in treatment and committed to a drug- and alcohol-free lifestyle. While these terms for the residences are commonly interchanged, they are referred to herein as "sober homes."

2.      Detox facilities assisted patients in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. After successfully completing detox or other inpatient services, patients received treatment for their underlying addiction in the form of outpatient care, through either PHPs, IOPs, and/or OPs. PHP, IOP, and OP patients attended facilities on an ongoing basis where treatment was rendered, generally in the form of group and individual therapy sessions. The distinction among the three different treatment plans related to, among other things, the amount of therapy time on a daily or weekly basis.

3.      Facilities that provided detox, residential treatment, PHP, IOP and OP were "clinical treatment facilities," as defined in Title 18, United States Code, Section 220(e)(2).

4.      Medical and osteopathic doctors played an essential role in substance abuse treatment. Without a doctor, patients at the substance abuse treatment centers would not have received prescriptions for drugs, received treatment, or had urine, blood, or other bodily fluid testing. Bodily fluid tests, which were prescribed by the doctors, were billed to health plans by the

---

[1] The Florida Department of Children and Families ("DCF"), which regulated and licensed treatment facilities in Florida, referred to PHP as Day or Night Treatment with Community Housing. Unlike IOP or OP patients who elected to live in a sober home and were required to pay their own rent or room and board, in a Day or Night Treatment with Community Housing program, room, board, and transportation were provided by the program, but only for PHP patients.

substance abuse treatment centers and/or laboratories, as were patient evaluations performed by a physician.

5.       DCF licensed and oversaw addiction treatment facilities that provided detox, residential treatment, PHP, IOP, and OP programs in Florida. Florida state regulations governed substance abuse treatment services, including standards for detox, residential treatment, PHP, IOP and OP. *See, e.g.*, Fl. Admin. Code §§ 65D-30.006, 65D-30.007, 65D-30.0081, 65D-30.0091 and 65D-30.010. One of the requirements that DCF placed on certain facilities was that they have a medical director.

6.       In Florida, substance abuse treatment services were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301. Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law. Fl. Stat. § 397.431.

7.       All "clinical treatment" under the Marchman Act was required to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. § 397.311(26)(a).

8.       The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"), also promulgated guidelines for varying levels of treatment based on the severity of the addiction, including detox and IOP.

9.       The American Society of Addiction Medicine ("ASAM") was a professional medical society representing over 6,000 physicians, clinicians, and associated professionals in the field of addiction medicine. ASAM published the ASAM Criteria, which was a collection of

objective guidelines that gave clinicians a way to standardize treatment planning and where patients were placed in treatment, as well as how to provide continuing, integrated care and ongoing service planning, including for detox, PHP, IOP, and OP treatment services.

10.    The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States.  With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

11.    The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

12.    Medical practitioners, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States.  21 U.S.C. § 822(b); 21 C.F.R. § 1306.03.  Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number, also known as a "DEA number," to each qualifying medical practitioner, including physicians and nurse practitioners.

13.    One form of treatment for substance abuse involved the use of a prescription controlled substance, buprenorphine, which was an opioid.  Buprenorphine was sometimes used in substance abuse treatment to wean opioid-addicted patients off of other opioids, including heroin and narcotic painkillers. Because drugs containing buprenorphine were Schedule III

controlled substances, meaning that there was a strong potential for abuse, resulting in fatal and non-fatal overdoses, prescribing physicians were also required to have two DEA registrations. The first registration was the standard "DEA number" referenced above that was required to prescribe any controlled substance. The second registration was a "DEA X-number," which was granted to a limited number of physicians with valid "DEA numbers," who had completed a training program on substance abuse treatment and fulfilled other regulatory requirements.

14.     The Drug Addiction Treatment Act ("DATA") of 2000 amended the CSA to permit physicians to treat opioid addiction using Schedules III-V, U.S. Food and Drug Administration ("FDA")-approved narcotic drug products without having to obtain a separate DEA registration as a narcotic treatment program. This was known as a "DATA-waiver."  Those registered with the DEA as DATA-waived physicians could treat 30 or 100 patients at any one time. In 2016, Congress passed the Comprehensive Addiction and Recovery Act ("CARA"), which amended the CSA to permit nurse practitioners and physician assistants registered with the DEA to also treat opioid addiction based on state authority. In 2016, the Department of Health and Human Services published a Federal Register Notice which increased the patient limitation to 275 for DATA-waived physicians.

**Bodily Fluid Testing in Substance Abuse Treatment**

15.     One monitoring strategy used by substance abuse treatment centers and medical professionals to detect recent drug or alcohol use by a patient was urine drug testing (and blood testing). There were two primary categories of urine drug testing: immunoassay testing (e.g., a drug screen or point of care ("POC") testing) and specific drug identification testing (e.g., definitive, or confirmatory, testing).

16.     POC urine testing involved collecting urine in a specific cup designed for testing. The specimen was analyzed using a color band or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs. POC tests typically cost between $5 and $10 and could be read easily by a layperson. This testing was convenient, and less costly, and the results could be read quickly. POC testing was the most common form of urine testing performed at treatment facilities.

17.     Definitive (or confirmatory) urine drug tests used gas liquid chromatography-mass spectrometry ("LCMS") and/or gas chromatography, or high-performance liquid chromatography, to analyze the urine specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. This testing was more precise, more sensitive, and detected more substances than other types of urine testing. Results of definitive testing took longer, and the tests were significantly more expensive than POC testing; single urine specimens that underwent drug screen analyzers and LCMS testing could be billed to insurance companies for thousands of dollars.

**Payment for Substance Abuse Treatment**

18.     Insurance coverage for substance abuse treatment and urine and blood testing was available through a number of avenues, including, but not limited to, the following private insurance companies:  Aetna Health Management LLC and Aetna Life Insurance for Members ("Aetna"), Blue Cross/Blue Shield ("BCBS"), Cigna Healthcare ("Cigna"), Magellan Health Inc., Medical Mutual, United Behavioral Health and United Health Group, Inc. ("United"), and Optum Health ("Optum") (collectively referred to hereinafter as the "Insurance Plans"). The Insurance Plans offered health care coverage directly to consumers and through employers, including ERISA and non-ERISA plans. They also managed health care plans offered to federal employees. The

Insurance Plans covered medical and clinical treatment costs of rehabilitation in accordance with the terms of their policies and state and federal law, including requirements that addiction treatment services and testing be medically necessary.

19.     Under the terms of insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were medically necessary and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

20.     The Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), and Title 18, United States Code, Section 220(e)(3).

21.     Typically, health care providers, including substance abuse treatment facilities, laboratories, and medical professionals, submitted claims for substance abuse treatment and bodily fluid testing to the Insurance Plans electronically, via interstate wires.

### The Defendants and Relevant Entities

### The Treatment Programs

22.     Second Chance Detox, LLC, d/b/a Compass Detox ("Compass Detox"), was a Florida company, located at 1151 Poinciana Drive, Pembroke Pines, Florida 33025.  Compass Detox was a substance abuse treatment center licensed with DCF that purportedly provided individuals, including beneficiaries of the Insurance Plans, with detox and residential treatment services.

23.     WAR Network, LLC ("WAR") was a Florida company, located at 137 SE 1st Avenue, Hallandale, Florida 33009.  WAR was a substance abuse treatment program licensed with DCF that purportedly provided individuals, including beneficiaries of the Insurance Plans, with

PHP, IOP, and OP services.  WAR provided community housing for PHP patients at an apartment-type building located at 116 SE 5th Avenue, Hallandale Beach, Florida 33009, known as "Oasis."

### The Laboratories

24.     Laboratory Pros, LLC ("Laboratory Pros") was a Florida company, located at 1701 Green Road, Suite A-1, Deerfield Beach, Florida 33064.

25.     Lab 1 was a Florida company located in Deerfield Beach, Florida.

26.     Lab 2 was a Florida company located in Sunrise, Florida.

27.     Lab 3 was a Florida company located in Miami, Florida.

28.     Lab 4 was a Florida company located in Miami, Florida.

29.     Lab 5 was a Florida company located in Miami, Florida.

30.     Lab 6 (together with Laboratory Pros and Lab 1 – Lab 5, the "Clinical Laboratories") was a Florida company located in North Miami Beach, Florida.

31.     Each of the Clinical Laboratories was a "laboratory," as defined in Title 18, United States Code, Section 220(e)(4), and Title 42, United States Code, Section 263a.

### Additional Entities

32.     Waterstone Capital Management, LLC ("Waterstone Capital Management") was a Florida company, located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.

33.     Asakim 18, LLC ("Asakim 18") was a Florida company, located at 250 95th Street 546996, Surfside, Florida 33154.

34.     Yeladim 18, LLC ("Yeladim 18") was a Florida company, located at 250 95th Street 546996, Surfside, Florida 33154.

35.     Right Direction Recovery, LLC ("Right Direction Recovery") was a Florida company, located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.

36.     Waterstone    Healthcare    Management,    LLC    ("Waterstone    Healthcare Management") was a Florida company. located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.  Asakim 18 and Waterstone Capital Management were the managers of Waterstone Healthcare Management.  Waterstone Healthcare Management, in turn, was the manager of Right Direction Recovery, Compass Detox, and WAR.

37.     Ness Group Foundation, Inc. ("Ness Group Foundation") was a Florida non-profit corporation, located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.

38.     Jade Holdings, LLC ("Jade Holdings") was a Florida company, located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.  Jade Holdings Delaware, LLC was a foreign limited liability company registered in Florida under the cross-reference name Jade Holdings, LLC.

39.     Closings.com, Inc. ("Closings.com") was a Florida company, located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.

40.     Josh Development, LLC was a Florida company, located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.

41.     Ella Development, LLC was a Florida company, located at 1124 Kane Concourse, Bay Harbor Islands, Florida 33154.

42.     Blaze & Baci LLC was a Florida company, located at 179 Bal Cross Drive, Bal Harbour, Florida 33154.

43.     Inner Strength Chiropractic & Rehab LLC ("Inner Strength Chiropractic") was a Florida company, located at 1108 Kane Concourse, Suite 300 B, Bay Harbor Island, Florida 33154.

44.     Recovery Empire, LLC ("Recovery Empire") was a Florida company, located at 9149 Garland Avenue, Surfside, Florida 33154.

45.     Mended Bridge Investments, LLC ("Mended Bridge") was a Florida company, located at 10275 Collins Avenue #430, Bal Harbour, Florida 33154.

### The Defendants and Related Individuals

46.     **JONATHAN MARKOVICH**, a resident of Miami-Dade County, was a CEO of Compass Detox, a co-owner of Compass Detox and WAR, the sole manager of Asakim 18 and Yeladim 18, a co-manager of Waterstone Healthcare Management, Right Direction Recovery, and Jade Holdings, and a co-director of the Ness Group Foundation.

47.     **RICHARD WASERSTEIN**, a resident of Miami-Dade County, was a co-owner of Compass Detox and WAR, the sole manager of Waterstone Capital Management, Closings.com, Josh Development, LLC, and Ella Development, LLC, a co-manager of Waterstone Healthcare Management and Right Direction Recovery, and a co-director of the Ness Group Foundation.

48.     **DANIEL MARKOVICH**, a resident of Miami-Dade County, was also a CEO, as well as the Compliance Officer, of Compass Detox, and a co-director of the Ness Group Foundation.

49.     **CHRISTOPHER GARNTO**, a resident of Miami-Dade County, was the Director of Operations of Compass Detox, and the manager of Recovery Empire, Mended Bridge, and Laboratory Pros.

50.     **DREW LIEBERMAN**, a resident of Miami-Dade County, was the Chief Medical Officer of Compass Detox, and a co-manager of Blaze & Baci LLC.

51.     **JOSE SANTEIRO**, a resident of Miami-Dade County, was the Medical Director for Compass Detox and WAR.

52.     **MARIO KUSTURA**, a resident of Miami-Dade County, was an employee of Compass Detox.

53.     **FRANK BOSCH, JR.**, a resident of Miami-Dade County, was an employee and contractor of Compass Detox.

54.     Dr. Jeffrey Draesel, Jr., a resident of Miami-Dade County, was a manager of Inner Strength Chiropractic who provided chiropractic services to Compass Detox and WAR patients.

55.     Elan Bakhshi, a resident of Nassau County, New York, was an employee and patient of Compass Detox and WAR.

### The Small Business Administration

56.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

57.     As part of this effort, the SBA facilitated loans through banks, credit unions, and other lenders.  The federal government backed these loans.

### The Paycheck Protection Program

58.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

59.     In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such affirmative certification was that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law."  In the PPP loan application, the small business (through its authorized representative) also had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

60.     A PPP loan application was processed by a participating financial institution ("lender").  If a PPP loan application was approved, the participating lender would fund the loan using its own monies, which were guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

61.     PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities.  Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on these permissible expense items within a designated period of time, and used a certain portion of the loan proceeds for payroll expenses.

**Relevant PPP Lender**

62.     Lender 1 was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"). Lender 1 was headquartered in Florida.

## COUNT 1
**Conspiracy to Commit Health Care Fraud and Wire Fraud**
**(18 U.S.C. § 1349)**

1.     Paragraphs 1 through 31, 33-34, 36, 43, 46, 48-51 and 54 of the General Allegations section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.     From in or around April 2017, and continuing through in or around October 2020, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JONATHAN MARKOVICH,**
**DANIEL MARKOVICH,**
**CHRISTOPHER GARNTO,**
**JOSE SANTEIRO,** and
**DREW LIEBERMAN,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, Dr. Jeffrey Draesel, Jr., Elan Bakhshi, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for

health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

       b.    to knowingly and with the intend to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.    It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to health care benefit programs via interstate wire communications; (b) concealing the submission of false and fraudulent claims to health care benefit programs; (c) concealing the receipt of the fraud proceeds; and (d) diverting the fraud proceeds for their personal use and benefit, and the use and benefit of others, and to further the fraud.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.    **JONATHAN MARKOVICH, DANIEL MARKOVICH,** and their co-conspirators established, operated, and controlled Compass Detox and WAR, which were purportedly in the business of providing effective clinical treatment services for persons suffering from alcohol and drug addiction.

5.       To obtain and retain patients for Compass Detox and WAR whose insurance, including the Insurance Plans, could be billed for substance abuse services, **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO,** and their co-conspirators offered and paid prospective patients kickbacks and bribes in the form of: money, gift cards, controlled substances (including illegal drugs), other prescription medications, compound medications, free interstate flights, bus and train tickets, allowing one patient to "piggyback" on another patient's insurance, and offering other "scholarships" in exchange for a patient referring other individuals with insurance (including beneficiaries of the Insurance Plans) for treatment.

6.       **CHRISTOPHER GARNTO** and his co-conspirators further paid patient recruiters kickbacks and bribes to refer patients to Compass Detox and WAR, and in return for individual patients to use the services of Compass Detox and WAR.

7.       **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators billed and caused to be billed to the Insurance Plans detox and residential treatment services for Compass Detox patients that were not in fact provided, were not provided as billed, were so substandard that they failed to serve a treatment purpose, and/or were medically unnecessary.

8.       **JONATHAN MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO,** and their co-conspirators billed and caused to be billed to the Insurance Plans PHP, IOP, and OP services for WAR patients.  In many instances, patients did not attend the purported PHP, IOP, and OP sessions at WAR, which were also not provided as billed, were so substandard that they failed to serve a treatment purpose, and/or were medically unnecessary.

9.       **JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators prescribed, caused to be prescribed, administered, and caused to be administered to Compass Detox and WAR

patients medications, including controlled substances, prescription medications, and over-the-counter medications, in quantities and combinations that at times grossly diverged from legitimate medical practice, and which were intended to offer patients a substitute for a narcotic or alcohol-induced high, primarily in order to keep patients docile and incentivize patients to attend and remain at Compass Detox and WAR.

10.     Another substance created at Compass Detox, known as a "comfort drink," was provided to patients routinely, including multiple times a day, pursuant to prescriptions reportedly signed by **DREW LIEBERMAN** and **JOSE SANTEIRO**. The "comfort drink," also referred to as a "comfort shot" and/or "comfort meds," was purportedly a compound medication created by **DREW LIEBERMAN**, as Chief Medical Officer of Compass Detox, and others. The "comfort drink" was primarily used to help patients feel high, and to keep patients docile and compliant so that they would attend and remain at Compass Detox.

11.     **JOSE SANTEIRO** and **DREW LIEBERMAN** overutilized the most abusable version of buprenorphine, which was an opioid sometimes used in addiction treatment, by prescribing to Compass Detox and WAR patients the version of buprenorphine with a brand name of Subutex, which does not contain naloxone, a medication that helps deter abuse.

12.     **JOSE SANTEIRO** and **DREW LIEBERMAN** issued overlapping prescriptions for buprenorphine to Compass Detox and WAR patients, at times even when **SANTEIRO**, **LIEBERMAN**, or another doctor had already issued a prescription for the same patient that did not yet need to be refilled.

13.     **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, DREW LIEBERMAN, JOSE SANTEIRO**, and their co-conspirators created or caused to be created therapy notes for Compass Detox and WAR falsely reflecting that patients

attended therapy when they did not, and/or falsely reflecting that therapy was actually provided when it was not.

14.     **JONATHAN MARKOVICH** and other co-conspirators hired **JOSE SANTEIRO** to serve as the Medical Director of Compass Detox and WAR, and in return **JOSE SANTEIRO** and his co-conspirators ordered urine drug and bodily fluid testing for Compass Detox and WAR's patients, regardless of whether such testing was medically necessary, actually conducted, or used in treatment.

15.     **CHRISTOPHER GARNTO**, through Laboratory Pros, further paid **JONATHAN MARKOVICH**, through Yeladim 18, kickbacks and bribes to refer urine samples for Compass Detox and WAR patients to Laboratory Pros, the Clinical Laboratory managed by **GARNTO**.

16.     **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO,** and their co-conspirators purchased for and provided to, and caused the purchase for and provision to, patients controlled substances and illegal drugs, so that these individuals would appear eligible for detox services when they presented at Compass Detox, when in fact such detox services were not medically necessary.  These patients were enrolled in and remained at Compass Detox and WAR receiving substance abuse services based on this false admission, i.e., based on the relapse caused by the conspirators' provision of drugs to the patients.

17.     **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators recycled and caused to be recycled patients through Compass Detox and WAR, as well as other treatment centers affiliated with co-conspirators, multiple times, including from a lower level of treatment at WAR to a higher level of treatment at Compass Detox for the primary purpose of being able to

bill the Insurance Plans for such additional treatment purportedly provided to these patients, regardless of whether this treatment was medically necessary or actually provided.

18.    **JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators provided little to no medical monitoring of patient care at Compass Detox and WAR, despite being the only licensed physicians associated with Compass Detox and WAR. As a result, among other problems, patients manifested physical symptoms of sedation and medication toxicity which went ignored by **SANTEIRO, LIEBERMAN,** and their co-conspirators, and instead were often classified as withdrawal symptoms thereby purportedly justifying additional medications and substance abuse treatment, regardless of whether such treatment was medically necessary or actually provided.

19.    **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators referred and caused to be referred Compass Detox and WAR patients for chiropractic services from Dr. Jeffrey Draesel, Jr., and Inner Strength Chiropractic, which were not provided, not provided as billed, and/or were medically unnecessary.

20.    **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators submitted and caused others to submit, via interstate wire communications, approximately $80,768,109 in claims to the Insurance Plans which falsely and fraudulently represented that various health care benefits, primarily substance abuse detoxification and residential treatment services, were medically necessary, prescribed by a doctor, actually provided, and provided as billed by Compass Detox to beneficiaries of the Insurance Plans.

21.    As a result of such false and fraudulent claims, the Insurance Plans made payments to the corporate bank accounts of Compass Detox, in the approximate amount of $24,687,180.

22.     **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators submitted and caused others to submit, via interstate wire communications, approximately $11,168,209 in claims to the Insurance Plans which falsely and fraudulently represented that various health care benefits, primarily substance abuse PHP, IOP, and OP services, were medically necessary, prescribed by a doctor, actually provided, and provided as billed by WAR to beneficiaries of the Insurance Plans.

23.     As a result of such false and fraudulent claims, the Insurance Plans made payments to the corporate bank accounts of WAR in the approximate amount of $2,291,426.

24.     **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators submitted and caused others to submit, via interstate wire communications, approximately $19,356,358 in claims to the Insurance Plans which falsely and fraudulently represented that various health care benefits, primarily laboratory testing services such as definitive urine drug tests, were medically necessary, prescribed by a doctor, and actually provided by the Clinical Laboratories to beneficiaries of the Insurance Plans.

25.     As a result of such false and fraudulent claims, the Insurance Plans made payments to the corporate bank accounts of the Clinical Laboratories in the approximately amount of $1,322,367.

26.     **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators submitted and caused others to submit, via interstate wire communications, approximately $588,230 in claims to the Insurance Plans which falsely and fraudulently represented that various health care benefits, primarily chiropractic services, were medically necessary, prescribed by a doctor, and actually

provided by Dr. Jeffrey Draesel, Jr., and Inner Strength Chiropractic to beneficiaries of the Insurance Plans.

27.    As a result of such false and fraudulent claims, the Insurance Plans made payments to the corporate bank account of Inner Strength Chiropractic in the approximate amount of $155,003.

28.    **JONATHAN    MARKOVICH,    DANIEL    MARKOVICH,    DREW LIEBERMAN, CHRISTOPHER GARNTO,** and their co-conspirators established and operated shell companies to distribute and conceal proceeds of the fraud.

29.    **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN,** and their co-conspirators used the proceeds of the fraud for their personal use and benefit, the use and benefit of others, and to further the fraud scheme.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-9
### Health Care Fraud
### (18 U.S.C. § 1347)

1.    Paragraphs 1 through 31, 33-34, 36, 43, 46, 48-51 and 54 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.    From in or around April 2017, and continuing through in or around October 2020, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JONATHAN MARKOVICH,
DANIEL MARKOVICH,
CHRISTOPHER GARNTO,
JOSE SANTEIRO,** and

**DREW LIEBERMAN,**

as described below, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was a purpose of the scheme and artifice for the defendants and their accomplices to unlawfully enrich themselves by, among other things:   (a) submitting and causing the submission of false and fraudulent claims to health care benefit programs via interstate wire communications; (b) concealing the submission of false and fraudulent claims to health care benefit programs; (c) concealing the receipt of the fraud proceeds; and (d) diverting the fraud proceeds for their personal use and benefit, and the use and benefit of others, and to further the fraud.

## THE SCHEME AND ARTIFICE

4.      The allegations contained in the Manner and Means of the Conspiracy section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## ACTS IN EXECUTION OR ATTEMPTED EXECUTION OF THE SCHEME AND ARTIFICE

5.      On or about the dates as to each count set forth below, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants, **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO,**

and **DREW LIEBERMAN**, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in that the defendants so identified below submitted and caused the submission of false and fraudulent claims seeking the identified dollar amounts, representing that the services listed below were medically necessary and actually provided:

| Count | Defendants Charged | Patient | Insurer | Approx. Claim Amount | Approx. Service Date | Provider Name | Claim No. & Description |
|-------|--------------------|---------|---------|----------------------|----------------------|---------------|------------------------|
| 2 | JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO and JOSE SANTEIRO | E.F. | BCBS | $3,126 | 9/26/2017 | Lab 1 | H100000627791653 <br><br> Code G0482 (Drug test def 15-21 classes) |
| 3 | JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO and DREW LIEBERMAN | N.D. | Optum | $3,100 | 1/22/2018 | Laboratory Pros LLC | 719939920701 <br><br> Code G0482 (Drug test def 15-21 classes) |
| 4 | JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO and DREW LIEBERMAN | T.F. | BCBS | $4,200 | 8/25/2018 | Laboratory Pros LLC | H100000692438328 <br><br> Code G0483 (Drug test def 22+ classes) |

| Count | Defendants Charged | Patient | Insurer | Approx. Claim Amount | Approx. Service Date | Provider Name | Claim No. & Description |
|---|---|---|---|---|---|---|---|
| 5 | JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO and DREW LIEBERMAN | W.J. | BCBS | $4,326 | 7/7/2019 | Compass Detox | H100000755034309 Revenue Code 126 (detox) |
| 6 | JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO and DREW LIEBERMAN | T.R. | BCBS | $4,326 | 7/26/2019 | Compass Detox | 100000759760327 Revenue Code 126 (detox) |
| 7 | JONATHAN MARKOVICH, CHRISTOPHER GARNTO and JOSE SANTEIRO | N.S. | BCBS | $2,250 | 9/6/2019 | Lab 4 | H100000765194928 Code G0482 (Drug test def 15-21 classes) |
| 8 | JONATHAN MARKOVICH, CHRISTOPHER GARNTO and JOSE SANTEIRO | A.N. | BCBS | $5,550 | 12/2/2019-12/6/2019 | WAR Network, LLC | H100000786406478 Code H0015 (Alcohol and/or drug services) |
| 9 | JONATHAN MARKOVICH, CHRISTOPHER GARNTO and JOSE SANTEIRO | R.C. | BCBS | $1,850 | 1/21/2020 | WAR Network, LLC | H100000801561920 Code H0015 (Alcohol and/or drug services) |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 10
### Conspiracy to Pay and Receive Kickbacks
### (18 U.S.C. § 371)

1.    Paragraphs 1 through 31, 34, 44-46, 48-49, 52-53 and 55 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.    From in or around November 2018, and continuing through in or around October 2020, in Broward and Miami-Dade Counties, in the Southern District of Florida and elsewhere, the defendants,

**JONATHAN MARKOVICH,**
**DANIEL MARKOVICH,**
**CHRISTOPHER GARNTO,**
**MARIO KUSTURA, and**
**FRANK BOSCH, JR.,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree, with each other and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.    to knowingly and willfully, with respect to services covered by a health care benefit program, that is the Insurance Plans, in and affecting interstate and foreign commerce, solicit and receive any remuneration (including any kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, and laboratory, in violation of Title 18, United States Code, Section 220(a)(1);

b.    to knowingly and willfully, with respect to services covered by a health care benefit program, that is the Insurance Plans, in and affecting interstate and foreign commerce, pay and offer any remuneration (including any kickback, bribe, and rebate), directly and indirectly,

overtly and covertly, in cash and in kind, to induce a referral of an individual to a recovery home, clinical treatment facility, and laboratory, in violation of Title 18, United States Code, Section 220(a)(2)(A); and

      c.    to knowingly and willfully, with respect to services covered by a health care benefit program, that is the Insurance Plans, in and affecting interstate and foreign commerce, pay and offer any remuneration (including any kickback, bribe, and rebate), directly and indirectly, overtly and covertly, in cash and in kind, in exchange for an individual using the services of a recovery home, clinical treatment facility, and laboratory, in violation of Title 18, United States Code, Section 220(a)(2)(B).

## PURPOSE OF THE CONSPIRACY

3.    It was a purpose of the conspiracy for the defendants and their co-conspirators to unjustly enrich themselves by, among other things:  (a) offering and paying kickbacks, bribes, and rebates to induce the referral of beneficiaries of the Insurance Plans to Compass Detox, WAR, and the Clinical Laboratories; (b) offering and paying kickbacks, bribes, and rebates in exchange for a beneficiary of the Insurance Plans using the services of Compass Detox, WAR, and the Clinical Laboratories; (c) soliciting and receiving kickbacks, bribes, and rebates in return for referring a patient and patronage to Compass Detox, WAR, and the Clinical Laboratories; (d) concealing and causing the concealment of kickbacks, bribes, and rebates; and (e) diverting kickback, bribes and rebates for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4. To obtain and retain patients for Compass Detox and WAR whose insurance, including the Insurance Plans, could be billed for substance abuse services, **JONATHAN MARKOVICH, DANIEL MARKOVICH, CHRISTOPHER GARNTO, MARIO KUSTURA, FRANK BOSCH, JR.,** Elan Bakhshi, and their co-conspirators offered and paid prospective patients kickbacks and bribes in the form of: money, gift cards, controlled substances (including illegal drugs), other prescription medications, compound medications, free interstate flights, bus and train tickets, allowing one patient to "piggyback" on another patient's insurance, and offering other "scholarships" in exchange for a patient referring other individuals with insurance (including beneficiaries of the Insurance Plans) for treatment.

5. **CHRISTOPHER GARNTO** and his co-conspirators further paid patient recruiters, including **MARIO KUSTURA, FRANK BOSCH, JR.,** and Elan Bakhshi, kickbacks and bribes to refer patients to Compass Detox and WAR, and in return for individual patients to use the services of Compass Detox and WAR.

6. **CHRISTOPHER GARNTO**, through Laboratory Pros, further paid **JONATHAN MARKOVICH**, through Yeladim 18, kickbacks and bribes to refer urine samples for Compass Detox and WAR patients to Laboratory Pros, the Clinical Laboratory managed by **GARNTO**.

## **OVERT ACTS**

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in Broward and Miami-Dade Counties, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1. On or about November 1, 2018, **CHRISTOPHER GARNTO** signed and caused to be signed check no. 1073 in the approximate amount of $15,859 from Laboratory Pros account

ending in 2645 with Bank of America payable to Yeladim 18, as a kickback for referring Compass Detox and WAR patients' urine samples to Laboratory Pros.

2.      On or about November 2, 2018, **JONATHAN MARKOVICH** deposited and caused to be deposited, in Yeladim 18's account ending in 1358 with Bank of America, check no. 1073 in the approximate amount of $15,859 from Laboratory Pros.

3.      On or about November 15, 2018, **CHRISTOPHER GARNTO** transferred and caused to be transferred approximately $2,000 from Mended Bridge's account ending in 3563 with Bank of America to **FRANK BOSCH, JR.**'s account ending in 9272 with Wells Fargo.

4.      On or about March 9, 2019, **FRANK BOSCH, JR.,** transferred approximately $150 to A.N., a Compass Detox patient, through Western Union, as a kickback for using the services of Compass Detox.

5.      On or about March 13, 2019, **DANIEL MARKOVICH** purchased and caused to be purchased an American Airlines flight from Dallas-Fort Worth, Texas, to Fort Lauderdale, Florida, for E.O., a former Compass and WAR patient, for approximately $508 using Chase credit card ending in 3684 in the name of **DANIEL MARKOVICH**, as a kickback for using the services of Compass Detox.

6.      On or about April 22, 2019, **MARIO KUSTURA** transferred approximately $100 to M.K., a Compass Detox patient, through Western Union, as a kickback for using the services of Compass Detox.

7.      On or about June 6, 2019, **FRANK BOSCH, JR.,** transferred approximately $125 to N.H., a Compass Detox patient, through Western Union, as a kickback for using the services of Compass Detox.

8.     On or about June 20, 2019, **CHRISTOPHER GARNTO** transferred approximately $600 to Elan Bakhshi through CashApp, as a kickback to induce the referral of patients to use the services of Compass Detox, WAR, and Laboratory Pros.

9.     On or about July 8, 2019, **CHRISTOPHER GARNTO** transferred approximately $200 to J.D., a Compass Detox and WAR patient, through CashApp, a wire transfer service, as a kickback for using the services of Compass Detox.

10.     On or about August 20, 2019, **DANIEL MARKOVICH** purchased and caused to be purchased an American Airlines flight from Santa Ana, California, to Miami, Florida, for J.M., a Compass Detox and WAR patient, for approximately $288 using Chase credit card ending in 3684 in the name of **DANIEL MARKOVICH**, as a kickback for using the services of Compass Detox.

11.     On or about November 1, 2019, **CHRISTOPHER GARNTO** transferred approximately $1,000 to N.S., a Compass Detox and WAR patient, through Zelle transfer from Chase account ending in 9530 held in the name of **GARNTO**, as a kickback for using the services of WAR and Laboratory Pros and in exchange for referring patients to Compass Detox, WAR, and Laboratory Pros.

12.     On or about December 30, 2019, **JONATHAN MARKOVICH** purchased and caused to be purchased a Southwest Airlines flight from Nashville, Tennessee, to Fort Lauderdale, Florida, for R.C., a Compass Detox and WAR patient, for approximately $442 using American Express credit card ending in 1077 in the name of Second Chance Detox, LLC, as a kickback for using the services of Compass Detox.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 11-18
### Payment and Offer of Kickbacks in Exchange for Use of Services
### (18 U.S.C. § 220(a)(2)(B))

1.      Paragraphs 1 through 31, 34, 44-46, 48-49, 52-53 and 55 of the General Allegations section of this Indictment are re-alleged and incorporated by referenced as though fully set forth herein.

2.      On or about the dates as to each count set forth below, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JONATHAN MARKOVICH,**
**DANIEL MARKOVICH,**
**CHRISTOPHER GARNTO,**
**MARIO KUSTURA,** and
**FRANK BOSCH, JR.,**

as identified in each count below, did knowingly and willfully pay and offer any remuneration, including any kickback, bribe, and rebate, namely, the payments specified as to each count below, directly and indirectly, overtly and covertly, in cash and in kind, in exchange for an individual using the services of recovery homes, clinical treatment facilities, and laboratories, that is, Compass Detox, WAR, and the Clinical Laboratories, with respect to services covered by a health care benefit program, that is, the Insurance Plans, each in and affecting interstate and foreign commerce:

| Count | Defendant(s)/ Sender | Approx. Payment Date | Approx. Payment Amount | Patient/ Individual | Description of Remuneration |
|---|---|---|---|---|---|
| 11 | **FRANK BOSCH, JR.** | 3/9/2019 | $150 | A.N. | Western Union control no. 4759190749 |
| 12 | **DANIEL MARKOVICH** | 3/13/2019 | $508 | E.O. | American Airline flight on 3/13/2019 from DFW to FLL purchased on Chase card ending in 3684 in the name of Daniel Markovich |
| 13 | **MARIO KUSTURA** | 4/22/2019 | $100 | M.K. | Western Union control no. 4383815965 |
| 14 | **FRANK BOSCH, JR.** | 6/6/2019 | $125 | N.H. | Western Union control no. 4039774115 |
| 15 | **CHRISTOPHER GARNTO** | 7/8/2019 | $200 | J.D. | CashApp transfer |
| 16 | **DANIEL MARKOVICH, CHRISTOPHER GARNTO and MARIO KUSTURA** | 8/20/2019 | $288 | J.M. | American Airlines flight on 8/20/2019 from SNA to MIA purchased on Chase card ending in 3684 in the name of Daniel Markovich |
| 17 | **CHRISTOPHER GARNTO** | 11/1/2019 | $1,000 | N.S. | Zelle transfer from Chase account ending in 9530 in name of Christopher J Garnto |
| 18 | **JONATHAN MARKOVICH and CHRISTOPHER GARNTO** | 12/30/2019 | $442 | R.C. | Southwest Airlines flight on 12/31/2019 from BNA to FLL purchased on AmEx card ending in 1077 in the name of Second Chance Detox, LLC |

In violation of Title 18, United States Code, Sections 220(a)(2)(B) and 2.

## COUNTS 19-21
## Payment and Offer of Kickbacks to Induce Referrals
### (18 U.S.C. § 220(a)(2)(A))

1.     Paragraphs 1 through 31, 34, 45-46, 49, 53 and 55 of the General Allegations section of this Indictment are re-alleged and incorporated by referenced as though fully set forth herein.

2.     On or about the dates as to each count set forth below, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendant,

### CHRISTOPHER GARNTO,

did knowingly and willfully pay and offer any remuneration, including any kickback, bribe, and rebate, namely, the payments specified as to each count below, directly and indirectly, overtly and covertly, in cash and in kind, to induce a referral of an individual to recovery homes, clinical treatment facilities, and laboratories, that is, Compass Detox, WAR, and the Clinical Laboratories, with respect to services covered by a health care benefit program, that is, the Insurance Plans, each in and affecting interstate and foreign commerce:

| Count | Approx. Payment Date | Approx. Payment Amount | Recipient | Description of Transaction |
|-------|---------------------|----------------------|-----------|---------------------------|
| 19 | 11/1/2018 | $15,859 | JONATHAN MARKOVICH | Check no. 1073 from Laboratory Pros Bank of America account ending in 2645 to Yeladim 18's Bank of America account ending in 1358 |
| 20 | 11/15/2018 | $2,000 | FRANK BOSCH, JR. | Transfer from Mended Bridge's Bank of America account ending in 3563 to Frank Bosch, Jr.'s Wells Fargo account ending in 9272 |
| 21 | 6/20/2019 | $600 | Elan Bakhshi | CashApp transfer |

In violation of Title 18, United States Code, Sections 220(a)(2)(A) and 2.

<u>COUNTS 22-23</u>
**Soliciting and Receiving Kickbacks**
**(18 U.S.C. § 220(a)(1))**

1.      Paragraphs 1 through 31, 34, 45-46, 49, 53 and 55 of the General Allegations section of this Indictment are re-alleged and incorporated by referenced as though fully set forth herein.

2.      On or about the dates as to each count set forth below, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JONATHAN MARKOVICH and**
**FRANK BOSCH, JR.,**

as identified in each count below, did knowingly and willfully solicit and receive any remuneration, including any kickback, bribe, and rebate, namely, the payments set forth as to each count below, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring a patient and patronage to a recovery home, clinical treatment facility, and laboratory, that is, Compass Detox, WAR, and the Clinical Laboratories, with respect to services covered by a health care benefit program, that is, the Insurance Plans, each in and affecting interstate and foreign commerce:

| Count | Defendant / Payee | Payor | Approx. Receipt Date | Approx. Payment Amount | Description of Transaction |
|---|---|---|---|---|---|
| 22 | **JONATHAN MARKOVICH** | CHRISTOPHER GARNTO | 11/2/2018 | $15,859 | Check no. 1073 from Laboratory Pros Bank of America account ending in 2645 to Yeladim 18's Bank of America account ending in 1358 |

| Count | Defendant / Payee | Payor | Approx. Receipt Date | Approx. Payment Amount | Description of Transaction |
|---|---|---|---|---|---|
| 23 | FRANK BOSCH, JR. | CHRISTOPHER GARNTO | 11/15/2018 | $2,000 | Transfer from Mended Bridge's Bank of America account ending in 3563 to Frank Bosch, Jr.'s Wells Fargo account ending in 9272 |

In violation of Title 18, United States Code, Sections 220(a)(1) and 2.

## COUNT 24
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.      Paragraphs 22 through 23 and 32 through 47 of the General Allegations Section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.      From in or around April 2017, and continuing through in or around October 2020, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

### JONATHAN MARKOVICH and
### RICHARD WASERSTEIN,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly, combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, to wit:

a.      to knowingly conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to

conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.      to knowingly engage in a monetary transaction by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property being derived from specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity, in violation of Title 18, United States Code, Section 1957(a).

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care and wire fraud, in violation of Title 18, United States Code, Section 1349.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 25-26
### Money Laundering
### (18 U.S.C. § 1956(a)(1)(B)(i))

On or about the dates as to each count set forth below, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

### JONATHAN MARKOVICH and
### RICHARD WASERSTEIN,

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed, in whole and

in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, as more specifically described below:

| Count | Approximate Date | Description of Financial Transaction |
|-------|------------------|--------------------------------------|
| 25 | 12/26/2018 | $1,000,000 transfer via check no. 5755 from account number ending in 3275 in the name of Second Chance Detox LLC d/b/a Compass Detox at BB&T to money market account number ending in 9575 in the name of Ness Group Foundation, Inc. with Marquis Bank; the memo line of the check reads, "Charitable Contribution" |
| 26 | 6/26/2019 | $1,000,000 wire transfer from account number ending in 3275 in the name of Second Chance Detox LLC d/b/a Compass Detox at BB&T to account number ending in 8769 in the name of Ness Group Foundation at Iberia Bank; the detail for this wire transfer reads, "contribution" |

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care and wire fraud, in violation of Title 18, United States Code, Section 1349.

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

### COUNTS 27-33
### Money Laundering
### (18 U.S.C. § 1957(a))

On or about the dates as to each count set forth below, in Broward and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

### JONATHAN MARKOVICH and
### RICHARD WASERSTEIN,

as described below, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000, and such property having been derived from

specified unlawful activity, knowing that the property involved in the monetary transaction was derived from some form of unlawful activity, as set forth below:

| Count | Approx. Date of Transaction | Defendant(s) | Description of Monetary Transaction |
|---|---|---|---|
| 27 | 12/12/2018 | **JONATHAN MARKOVICH; RICHARD WASERSTEIN** | Approx. $480,000 transfer via check no. 5726 from account number ending in 3275 in the name of Second Chance Detox d/b/a Compass Detox at BB&T to account number ending in 3551 in the name of Waterstone Capital Management, LLC at Bank of America |
| 28 | 12/12/2018 | **JONATHAN MARKOVICH** | Approx. $480,000 transfer via check no. 5727 from account number ending in 3275 in the name of Second Chance Detox d/b/a Compass Detox at BB&T to account number ending in 8632 in the name of Asakim 18, LLC at Bank of America |
| 29 | 12/17/2018 | **RICHARD WASERSTEIN** | Approx. $200,000 transfer via check no. 1107 from account number ending in 3551 in the name of Waterstone Capital Management LLC at Bank of America to account number ending in 9115 in the name of Josh Development, LLC at Regions Bank |
| 30 | 12/31/2018 | **JONATHAN MARKOVICH; RICHARD WASERSTEIN** | Approx. $200,000 transfer by check no. 5776 from account number ending in 3275 in the name of Second Chance Detox d/b/a Compass Detox at BB&T to account number ending in 9200 in the name of Waterstone Healthcare Management, LLC at Bank of America |
| 31 | 12/31/2018 | **JONATHAN MARKOVICH; RICHARD WASERSTEIN** | Approx. $500,000 transfer via check no. 5779 from account number ending in 3275 in the name of Second Chance Detox d/b/a Compass Detox to account number ending in 9122 in the name of Right Direction Recovery, LLC at Bank of America |
| 32 | 2/28/2019 | **JONATHAN MARKOVICH; RICHARD WASERSTEIN** | Approx. $638,259 transfer via check no. 1002 from account number ending in 9122 in the name of Right Direction Recovery, LLC at Bank of America to account ending in 2369 in the name of Closings.com at Regions Bank |

| Count | Approx. Date of Transaction | Defendant(s) | Description of Monetary Transaction |
|-------|------------------------------|--------------|-------------------------------------|
| 33 | 8/28/2019 | **JONATHAN MARKOVICH** | Approx. $500,000 transfer via check no. 999 from account number ending in 8632 in the name of Asakim 18 LLC at Bank of America to account number 9682 in the name of Jonathan Markovich POD Daniel Markovich at Iberia Bank. |

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care and wire fraud, in violation of Title 18, United States Code, Section 1349.

In violation of Title 18, United States Code, Sections 1957(a) and 2.

**COUNTS 34-35**
**Bank Fraud**
**(18 U.S.C. § 1344(2))**

1.      Paragraphs 22, 23, 46, and 56 through 62 of the General Allegations Section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

2.      From in or around April 2020 through in or around October 2020, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**JONATHAN MARKOVICH,**

knowingly, and with intent to defraud, executed and attempted to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, that is, Lender 1, by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts.

**PURPOSE OF THE SCHEME AND ARTIFICE**

3.　　It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by:  (a) submitting false and fraudulent PPP loan applications to financial institutions falsely representing that the applicant entities were not engaged in violations of federal, state, and local law; and (b) concealing and causing the concealment of these false and fraudulent applications.

**THE SCHEME AND ARTIFICE**

4.　　The allegations contained in the Manner and Means of the Conspiracy sections of Counts 1, 10, and 24 are re-alleged and incorporated by reference as though fully set forth herein as a description of some of the illegal activities in which **JONATHAN MARKOVICH** was engaged in, including in or around April 2020, when **JONATHAN MARKOVICH** applied for PPP loans for Compass Detox and WAR.

5.　　On or about April 24, 2020, **JONATHAN MARKOVICH** submitted, and caused the submission of, a PPP application in the name of Compass Detox seeking a PPP loan in the amount of approximately $511,807 (the "Compass Detox PPP Application"). In the Compass Detox PPP application, **JONATHAN MARKOVICH** represented himself to be an owner of Compass Detox.

6.　　The Compass Detox PPP Application submitted by **JONATHAN MARKOVICH,** included the false representation that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law."

7.　　Based on this and other information provided to Lender 1 in the Compass Detox PPP Application, Lender 1 approved and funded the PPP loan.  On or about May 6, 2020,

approximately $511,807 was transferred from Lender 1 to a bank account held in the name of Compass Detox at Lender 1.

8.      On or about April 24, 2020, **JONATHAN MARKOVICH** submitted, and caused the submission of, a PPP application in the name of WAR seeking a PPP loan in the approximate amount of $46,455 (the "WAR PPP Application").   In the War PPP Application, **JONATHAN MARKOVICH** represented himself to be an owner of WAR.

9.      The WAR PPP Application submitted by **JONATHAN MARKOVICH** included the false representation that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law."

10.      Based on this and other information provided to Lender 1 in the WAR PPP Application, Lender 1 approved and funded the PPP loan.  On or about May 7, 2020, approximately $46,455 was transferred from Lender 1 to a bank account held in the name of WAR at Lender 1.

## ACTS IN EXECUTION OR ATTEMPTED EXECUTION OF THE SCHEME AND ARTIFICE

11.      On or about April 24, 2020, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, **JONATHAN MARKOVICH,** knowingly executed and attempted to execute the above-described scheme to defraud by committing and causing others to commit the following acts, each of which constituted an execution of the fraudulent scheme:

| Count | Approx. Date of Application | Description |
|-------|---------|-------------|
| 34 | 4/24/2020 | Submission of the Compass Detox PPP Application. |
| 35 | 4/24/2020 | Submission of the WAR PPP Application. |

All in violation of Title 18, United States Code, Sections 1344(2) and 2.

**FORFEITURE ALLEGATIONS**
**(18 U.S.C. § 981(a)(1)(C))**
**(18 U.S.C. § 982(a)(1) and (a)(7))**

1.      The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which any of the defendants, **JONATHAN MARKOVICH, RICHARD WASERSTEIN, DANIEL MARKOVICH, CHRISTOPHER GARNTO, JOSE SANTEIRO, DREW LIEBERMAN, MARIO KUSTURA,** and **FRANK BOSCH, JR.,** have an interest.

2.      Upon a conviction of a violation of Title 18, United States Code, Sections 1343, 1347, 1349, or 371 as alleged in this Indictment, defendants so convicted shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      Upon conviction of a violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(h), or 1957(a), as alleged in this Indictment, the defendants so convicted shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.      Upon conviction of a violation of Title 18, United States Code, Section 1344, as alleged in this Indictment, the defendant so convicted shall forfeit to the United States any property constituting or derived from, proceeds obtained directly or indirectly, as the result of the violation, pursuant to Title 18 United States Code, Section 982(a)(2)(A).

5.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

    a.    All funds formerly on deposit in account numbers 0000242203275 and 0000246489483 at Truist Bank;

    b.    All funds formerly on deposit in account numbers 898082983551, 229055738632, 229055319200, 898096489122, and 003765605611 at Bank of America;

    c.    All funds formerly on deposit in account number 11049575 at Marquis Bank; and

    d.    All funds formerly on deposit in account number 4200100297 at Iberia Bank.

6.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), 982(a)(1), 982(a)(2)(A), 982(a)(7), Title 21, United States Code, Section 853, and Title 28, United Stats Code, Section 2461(c).

A TRUE BILL

FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

DANIEL KAHN
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

ALLAN MEDINA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JAMES V. HAYES
SENIOR LITIGATION COUNSEL
JAMIE DE BOER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

JONATHAN MARKOVICH, et al.

_____ Defendants.   /

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division**: (Select One)

| | | |
|---|---|---|
| ___ | Miami | ___ Key West |
| ✓ | FTL | ___ WPB   ___ FTP |

New defendant(s)            Yes ____   No ____
Number of new defendants         ____
Total number of counts           ____

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:      (Yes or No)      No____
    List language and/or dialect      _____

4.  This case will take   20   days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)

| | | | | (Check only one) | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | | Petty | _____ |
| II | 6 to 10 days | _____ | | Minor | _____ |
| III | 11 to 20 days | ✓ | | Misdem. | _____ |
| IV | 21 to 60 days | _____ | | Felony | ✓ |
| V | 61 days and over | _____ | | | |

6.  Has this case previously been filed in this District Court?      (Yes or No)      No

    If yes: Judge _____      Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?      (Yes or No)      Yes
    If yes: Magistrate Case No.      20-6469-MJ-HUNT
    Related miscellaneous numbers:      _____
    Defendant(s) in federal custody as of      _____
    Defendant(s) in state custody as of      _____
    Rule 20 from the District of      _____

    Is this a potential death penalty case? (Yes or No)      No

7.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?      Yes ____      No ✓

8.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?      Yes ____      No ✓

9.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?      Yes ____      No ✓

_____
JAMES V. HAYES
ASSISTANT UNITED STATES ATTORNEY

*Penalty Sheet(s) attached

REV 6/5/2020

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: JONATHAN MARKOVICH

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

\* **Max. Penalty**: Twenty (20) years' imprisonment

Counts #: 2-9

Health Care Fraud

Title 18, United States Code, Section 1347

\* **Max. Penalty**: Ten (10) years' imprisonment as to each count

Count #: 10

Conspiracy to Pay and Receive Kickbacks

Title 18, United States Code, Section 371

\* **Max. Penalty**: Five (5) years' imprisonment

Count #: 18

Payment and Offer Kickbacks in Exchange for Use of Services

Title 18, United States Code, Section 220(a)(2)(B)

\* **Max. Penalty**: Ten (10) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

Count #: 22

Soliciting and Receiving Kickbacks

Title 18, United States Code, Section 220(a)(1)

**\* Max. Penalty**: Ten (10) years' imprisonment

Count #: 24

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\* Max. Penalty**: Twenty (20) years' imprisonment

Counts #: 25-26

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\* Max. Penalty**: Twenty (20) years' imprisonment as to each count

Counts #: 27-28, 30-33

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\* Max. Penalty**: Ten (10) years' imprisonment as to each count

Counts #: 34-35

Bank Fraud

Title 18, United States Code, Section 1344(2)

**\* Max. Penalty**: Thirty (30) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: RICHARD WASERSTEIN

**Case No**:

Count #: 24

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\* Max. Penalty**: Twenty (20) years' imprisonment

Counts #: 25-26

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\* Max. Penalty**: Twenty (20) years' imprisonment as to each count

Counts #: 27, 29-32

Money Laundering

Title 18, United States Code, Section 1957(a)

**\* Max. Penalty**: Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**: DANIEL MARKOVICH

**Case No**: _____

Count #: 1

Conspiracy to commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

\* **Max. Penalty**: Twenty (20) years' imprisonment

Counts #: 2-6

Health Care Fraud

Title 18, United States Code, Section 1347

\* **Max. Penalty**: Ten (10) years' imprisonment as to each count

Count #: 10

Conspiracy to Pay and Receive Kickbacks

Title 18, United States Code, Section 371

\* **Max. Penalty**: Five (5) years' imprisonment

Counts #: 12 and 16

Payment and Offer Kickbacks in Exchange for Use of Services

Title 18, United States Code, Section 220(a)(2)(B)

\* **Max. Penalty**: Ten 10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name**: CHRISTOPHER GARNTO

**Case No**:

Count #: 1

Conspiracy to commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

* **Max. Penalty**: Twenty (20) years' imprisonment

Counts #: 2-9

Health Care Fraud

Title 18, United States Code, Section 1347

* **Max. Penalty**: Ten (10) years' imprisonment as to each count

Count #: 10

Conspiracy to Pay and Receive Kickbacks

Title 18, United States Code, Section 371

* **Max. Penalty**: Five (5) years' imprisonment

Counts #: 15-18

Payment and Offer Kickbacks in Exchange for Use of Services

Title 18, United States Code, Section 220(a)(2)(B)

* **Max. Penalty**: Ten 10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

Counts #: 19-21

Payment and Offer of Kickbacks to Induce Referrals

Title 18, United States Code, Section 220(a)(2)(A)

\* **Max. Penalty**: Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name**: JOSE SANTEIRO

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**: Twenty (20) years' imprisonment

Counts #: 2-9

Health Care Fraud

Title 18, United States Code, Section 1347

**\* Max. Penalty**: Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: DREW LIEBERMAN

**Case No**:

Count #: 1

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**: Twenty (20) years' imprisonment

Counts #: 3-6

Health Care Fraud

Title 18, United States Code, Section 1347

**\* Max. Penalty**: Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: MARIO KUSTRA

**Case No**:

Count #: 10

Conspiracy to Pay and Receive Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**: Five (5) years` imprisonment

Counts #: 13 and 16

Payment and Offer Kickbacks in Exchange for Use of Services

Title 18, United States Code, Section 220(a)(2)(B)

**\* Max. Penalty**: Ten (10) years` imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name**: <u>FRANK BOSCH, JR.</u>

**Case No**:

Count #: 10

Conspiracy to Pay and Receive Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**: Five (5) years' imprisonment

Counts #: 11 and 14

Payment and Offer Kickbacks in Exchange for Use of Services

Title 18, United States Code, Section 220(a)(2)(B)

**\* Max. Penalty**: Ten (10) years' imprisonment as to each count

Count #: 23

Soliciting and Receiving Kickbacks

Title 18, United States Code, Section 220(a)(1)

**\* Max. Penalty**: Ten (10) years' imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**